[Civ. No. 1378.   Fourth Appellate District.—March 1, 1935.]

T. WAYNE SWITZER et al., Respondents, v. WILLIAM O. YUNT et al., Appellants.

J. A. Chase for Appellants.

MARKS, J.—Plaintiffs and defendants are owners of tracts of land in Tulare County on opposite sides of a county road which runs north and south. Defendants own eighty acres which extend one-half mile along the east side of the road, and plaintiffs own twenty acres which extend one-eighth of a mile along its west side. The south boundaries of the two tracts form a straight line. The county road is graded above the level of the adjoining lands for the entire distance of one-half mile except in two places, one being just south of the north line of plaintiff's property, and the other in a place that does not concern us. At the point we have mentioned, for about eighty feet, the road is a few inches below the grade of defendants' property, but it is several inches above the grade of plaintiffs' property. The road had gutters on both its sides below the surface grades of both properties. Thus the road formed an effective dam against the free flow of surface waters from east to west except at the two points mentioned.

All of the land in the neighborhood of the tracts in question was what is designated by a department of the federal government as "hog wallow land" which had to be leveled before it could be successfuly farmed. The evidence shows that in its natural state defendants' land had upon it a depression of not more than one and one-half acres in area and of not more than two feet in depth. It was referred to by many witnesses as a "duck pond" and was situated near the west boundary and about halfway between the north and south boundary lines of defendants' property. There were two other smaller depressions on defendants' land and one on plaintiffs'. These depressions held surface water during the rainy season and several witnesses for plaintiffs testified that over a period of a number of years they had never seen water draining from the duck pond. It would seem that the purpose of this evidence was to lay the foundation for the conclusion that when the land was in its natural state the duck pond furnished a reservoir for all surface waters and prevented their draining away.

Plaintiffs graded and planted their land to grapevines about the year 1921. Shortly thereafter the defendants

graded and planted the north forty acres of their property, and later graded and planted the south forty acres. In these operations the hog wallows were leveled and the bottom of the duck pond was raised, though just how much is not apparent. It continued to be the low point on defendant' property.

It is not questioned that in its original state, as well as after the grading operations were completed, the general slope of the country was from northeast to southwest. The north twenty acres of defendants' property was irrigated from north to south, the next thirty acres from east to west, the next ten acres from south to north, and the south twenty acres from north to south. All lands adjoining the road on the west side of defendants' property, including plaintiffs' property, was irrigated from east to west.

The southwesterly slope of the country was gentle. There is in the record a profile map of the county road and the property immediately adjoining its sides. The profile line of the center of the road does not show a change of grade of more than three feet six inches and those of the properties immediately adjoining it a change of grade of not more than three feet two inches in the one-half mile depicted. Mr. Switzer was of the opinion that the westerly fall across his property and the twenty-acre tract adjoining it on the west was not more than five feet.

In 1930 or 1931 the use of defendants' south forty acres was changed from growing alfalfa to growing citrus trees. The alfalfa land had been blocked into squares by ridges which held drainage waters upon the ground. This blocking was abandoned when the citrus trees were planted. During the rainy season of 1931–32 some trouble was experienced by defendants because of the backing up of rain water against the road which flooded portions of their orchard. By arrangement with the owner this water was drained under the road and into a drainage pit on the property adjoining plaintiffs' property on the north. During the rainy season of 1932–33 defendants threatened to sue the county of Tulare for damages to their land and trees if drainage were not provided under the county road. Plaintiffs threatened to sue the county if such drainage were provided in front of or near the front of their property.

On January 28, 1933, the county of Tulare installed an eight-inch drain pipe under the road at a point a short distance north of the northeast corner of plaintiffs' property. Some time during that afternoon Mr. Switzer and his neighbor to the north built a dirt dam along the east side of their properties with its center about opposite the drain pipe. A hard rain started that same afternoon and lasted through the night and into the next day. During the night the dam broke near the northeast corner of plaintiffs' property. The water washed top soil and fertilizer that had just been spread off the property. Mr. Switzer and another witness testified that before the storm they saw an employee of defendants digging ditches along the east side of the road and on the west side of defendants' property. After the storm dug ditches were found, one leading from the duck pond on defendants' property and emptying into the gutter of the road near the east end of the drain pipe, a second dug ditch in the east gutter of the road draining water from north to south, and a third dug ditch in the east gutter draining water from south to north in the direction of the drain pipe.

Neither party contends that the rain commencing on January 28th was a great and unusual storm or that the water that collected on defendants' property was flood water or anything more than surface drainage water precipitated by the storm.

Plaintiffs instituted this action and prayed that they recover their damages caused by the erosion of their land and that defendants "be perpetually enjoined and restrained from allowing any surface or rain water or any water from their said land to empty upon, flood or run over the land of plaintiffs, and that said defendants be restrained from running any surface or rain water or any other water from their land onto the land of plaintiffs". Defendants filed a cross-complaint whereby they sought to enjoin plaintiffs from obstructing the natural flow of surface water across their land.

It was evidently the theory of the plaintiffs at the trial, and is again asserted here, that the duck pond on defendants' property, before it had been leveled, furnished a natural reservoir which restrained all surface and storm waters falling or draining upon defendants' land; that defendants

partially filled it when they leveled their property; that they should not have been permitted to fill in low places or change the natural contour of the ground; that having done so, by leveling their land, they were responsible for the damages suffered by plaintiffs. This theory was adopted by the trial court in its findings.

The judgment is drawn upon another theory. It gave plaintiffs damages in the sum of $200. It provided that defendants be "perpetually enjoined and restrained from causing by artificial means any surface water to flow from their land onto the land of plaintiffs T. Wayne Switzer and Winifred Switzer, as above described". It also provided that plaintiffs be "perpetually enjoined and restrained from maintaining any dam or bank which will cause any surface water that naturally flows or may naturally flow from defendants' land, as it now exists, over the County road, which lies between the land of plaintiffs and defendants, against said dam or bank so as to cause said surface water to be turned back or held on defendants' land".

We must first consider the right of an owner of property to level his land so that it may be made fit for cultivation. In so doing it must be borne in mind that the duck pond was not a permanent lake or pond. It was originally a low place into which surface waters drained during the rainy season. It was dry the greater portion of each year.

The great valleys of central and southern California are by nature arid, in some parts they are desert lands. Neither the arid nor the desert lands can be devoted to agricultural, horticultural, viticultural or citricultural purposes without irrigation. Hog wallow land is not uncommon in these areas. While the San Joaquin Valley is, generally speaking, level, the surface of the ground is gently undulating. Large tracts here and in Southern California cannot be successfully irrigated without first leveling the ground. This is particularly true of the hog wallow lands. If it be the law in California that an owner of land cannot level it the result "would be to condemn to sterility vast acreages of agricultural lands situate in the state". (*Coombs* v. *Reynolds*, 43 Cal. App. 656 [185 Pac. 877].)

We find the following note in 11 Annotated Cases, 1144: "Even courts which deny the right of the owner of higher

land to discharge upon the lower land, by artificial drains or ditches, water collected in ponds or sag holes, hold that the owner may, for the purpose of cultivating his land, fill up sag holes, though the water collected therein may thereby find its way to the lower land. (*Launstein* v. *Launstein,* 150 Mich. 524 [114 N. W. 383, 121 Am. St. Rep. 635]. Compare *Pickerill* v. *Louisville,* 30 Ky. Law Rep. 1239 [100 S. W. 873].) The right of the owner to·change the surface of his land was also involved in *Applegate* v. *Franklin,* 109 Mo. App. 293 [84 S. W. 347], wherein it appeared that the defendant drained a large pond or lake which covered part of his as well as the plaintiff's land, thereby destroying the plaintiff's fishing business. It was held that an owner has the right to drain his land for any desirable purpose, provided the drainage is performed in a reasonably careful manner. See, also, *Mehornay* v. *Foster,* (1908) 132 Mo. App. 229 [111 S. W. 882].'' (See *Bennett* v. *Cupina,* 253 N. Y. 436 [171 N. E. 698]; *Harbison* v. *City of Hillsboro,* 103 Or. 257 [204 Pac. 613].)

The case of *Jennings* v. *Bohner,* 134 N. Y. Supp. 943, is factually identical with the instant case. The court there held that the owner of the higher land had the right to fill by grading, a low place on his property which formed a pond so that. it could be cultivated, but did not have the right to concentrate the water in a ditch and precipitate it onto the lower land of his neighbor through the ditch and culvert under the road which separated the properties.

The case of *Coombs* v. *Reynolds, supra,* presented a somewhat similar question to the one we are considering. There it was contended that the farming operations on the dominant tenement caused an increased flow of surface water onto the servient tenement and consequent damage to it. It was the opinion of the court that an owner of property had the right to cultivate it and make use of it for the purposes for which it was best suited and that if the natural general flow of surface water was not changed such owner would only be liable for injuries resulting from such cultivation, in the event it was performed in a negligent or wilful manner. The court there said: ''The courts of this state are committed to the rule of the civil law respecting the law of surface or storm waters. (*McDaniel* v. *Cummings,* 83

Cal. 515 [8 L. R. A. 575, 23 Pac. 795]; *Los Angeles C. Assn.* v. *Los Angeles,* 103 Cal. 461 [37 Pac. 375]; *Wood* v. *Moulton,* 146 Cal. 317 [80 Pac. 92].) While the civil law protected a lower proprietor against an upper from injuries resulting from sending surface waters down to the lower owner in a manner different from their natural flow, yet 'there was, however, one act of man excepted . . . and that was the tilling of the fields in the natural way'. (Kinney on Irrigation and Water Rights, 2d ed., sec. 560; *Martin* v. *Jett,* 12 La. 501 [32 Am. Dec. 120], and case note.)''

In the instant case we have concluded that the defendants had the right to level their land in order to make it fit for cultivation and in so doing had also the right to deposit surplus dirt in the bottom of the duck pond thus rendering it, too, fit for cultivation. This work did not change the general natural slope and drainage of the locality. It was still from northeast to southwest. In its natural state if the duck pond overflowed, the water would take a general southwesterly course and find its way onto part of plaintiffs' property. It is true that a number of witnesses for plaintiffs testified that they had never seen it overflow. This did not establish the fact that it would not if sufficient water drained into it. These same witnesses testified that they had never seen it cover an area of more than one and one-half acres. There is undisputed evidence before us that during the storm in question the pond on defendants' property covered an area of at least five acres. It is self-evident that had the pond been in its original state it would not have restrained the waters of this storm. They would have followed the fall of the land to the southwest.

We are also of the opinion that defendants did not have the right to increase the drainage from their land by digging ditches to convey the water toward plaintiffs' land. This conclusion is supported by the great majority of cases in those states following the civil law rules concerning the flow of surface waters. (*Wood* v. *Moulton,* 146 Cal. 317 [80 Pac. 92]; *Galbreath* v. *Hopkins,* 159 Cal. 297 [113 Pac. 174].)

It is clear that plaintiffs did not have the right to build a dam to withhold surface waters from draining across their property. The defendants possessed the higher property with the natural drainage to the southwest. This prop-

erty, the dominant tenement, possessed an easement over plaintiffs' lower property, the servient tenement, which prevented plaintiffs from interfering with the free drainage of surface waters in the direction provided by nature. (*Le-Brun* v. *Richards*, 210 Cal. 308 [291 Pac. 825, 72 A. L. R. 336].)

It is probable that part of the damage suffered by plaintiffs was attributable to the acts of the county of Tulare. Its road was graded to an elevation above that of the adjacent land except at two points. The road formed a dam that effectively checked the natural flow of the surface water to the southwest. There was but one drain under the road in the half mile of its length we have in question here. This had the effect of concentrating and discharging the restrained surface water at one point near the corner of plaintiffs' property. The washing of the land below the one point of discharge would be a natural result of this condition. However, defendants hastened and increased the flow of the water by digging the ditches we have mentioned. These ditches undoubtedly contributed to the injury suffered by plaintiffs by increasing the discharge through the drain. Where parties contribute to damage which has been caused by their acts and the acts of another they cannot escape liability because their proportionate contribution is not accurately measured. (*Reclamation District No. 833* v. *American Farms Co.*, 209 Cal. 74 [285 Pac. 688].)

Defendants complain bitterly of the findings of the trial court. It must be admitted that several of the findings were drawn upon a theory not supported by the law applicable to the case. These findings were not carried into the judgment. As we have seen, the judgment awarded damages to plaintiffs. This award is supported by the evidence and findings. It enjoined plaintiffs from interfering with the natural flow of surface water across their property. This is supported by the evidence and findings and is in accord with the law of this state. It enjoined defendants from causing surface water to flow onto the land of the plaintiffs *by artificial means*. This is supported by the evidence and findings and the law applicable to the case. The ditches dug by defendants were the only *unlawful* artificial means shown to have been employed by them which con-

tributed to the damage suffered by plaintiffs. However, that they did contribute to this damage is established and is sufficient to support the judgment. The judgment, as we interpret it, only restrains defendants from increasing the natural flow of surface waters from their property by *unlawful* artificial means, such as dug ditches, not by the lawful grading and leveling of their property which left unchanged the general natural slope of that part of the country. ■ The other findings, which were not carried into the judgment, may be treated as surplusage and disregarded. (*Morris* v. *Turley*, 94 Cal. App. 691 [271 Pac. 916].)

■ Defendants contend that the complaint fails to state facts sufficient to constitute a cause of action. Without extending this opinion by a detailed analysis of that pleading it is sufficient to say that while it should not serve as a model for future use it is not vulnerable to that attack.

Judgment affirmed.

Barnard, P. J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on March 28, 1935.